[No. A032176. First Dist., Div. Four. Dec. 19, 1986.]

CITIZENS FOR NON-TOXIC PEST CONTROL et al.,
Plaintiffs and Respondents, v.
DEPARTMENT OF FOOD AND AGRICULTURE et al.,
Defendants and Appellants.

1578

COUNSEL

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Roderick E. Walston and Charles W. Getz IV, Deputy Attorneys General, for Defendants and Appellants.

Victor M. Sher, Lobdell, Miller & Sher, Michael B. Endicott and Ben T. Allen for Plaintiffs and Respondents.

OPINION

ANDERSON, P. J.—This is an appeal from a judgment ordering relief in mandamus and granting injunctive relief to a group of environmentalists and commercial organic produce growers who sought to prohibit the Cali-

fornia Department of Food and Agriculture (CDFA) from proceeding with a 1985 project to control and eradicate the apple maggot fruit fly (AMFF) in California.

Plaintiffs, Citizens for Non-Toxic Pest Control, John C. Laboyteaux III, Patricia Suzanne Laboyteaux, David and Susan Hagemann, the Humboldt Herbicide Task Force, Phil McCulley, Ernest and Myrtle Carter, Tim Carter, and Dan Carter (respondents) claimed that defendants CDFA and its director, Clare Berryhill (appellants) violated the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.) by failing to prepare and consider an environmental impact report (EIR) (§ 21061) before commencing to locate and eliminate the AMFF through trapping, quarantine measures and the spraying of a pesticide known commercially as "Imidan." The court below (1) ordered that a peremptory writ of mandate issue commanding CDFA to suspend all activity with respect to its AMFF project "for 1985 and future years" until it completed an EIR unless CDFA commenced the EIR process in good faith within 10 days of the July 25, 1985, judgment,[2] and (2) enjoined CDFA "from spraying any toxic pesticide on any private property where objected to by the owner or occupant of said property," as long as the objectors agreed to engage in certain alternative eradication measures. CDFA's filing a timely notice of appeal automatically stayed the effect of the relief in mandamus (Code Civ. Proc., §§ 916, 1110b; see *Hayworth* v. *City of Oakland* (1982) 129 Cal.App.3d 723, 727 [181 Cal.Rptr. 214]); however, on August 2, 1985, we denied appellants' request for an immediate stay of the preliminary injunction.

Appellants contend that the court below erred in finding that respondents filed their complaint within the 180-day limit set forth in section 21167. They also argue that CDFA's program to eradicate the AMFF in 1985 was not a "project" within the meaning of section 21065, so that it did not fall within CEQA regulations. (§ 21080, subd. (a).) Most importantly, they maintain that the trial court incorrectly held a "functional equivalency" provision, which could have excused CDFA from preparing an EIR (§ 21080.5), inapplicable to programs for eradicating insect pests. We agree in part with the latter argument; nonetheless, we affirm the judgment.

### I. *Action for Relief Timely Filed*

■ Appellants complain that the trial court erred in finding that since CDFA commenced its AMFF eradication project between June 13 and July

---

[1] Unless otherwise indicated, all statutory references are to the Public Resources Code.

[2] CDFA chose not to begin the EIR process within 10 days but rather, shut down the project for the remainder of the 1985 season. It is, therefore, unnecessary to detail the restrictions imposed with regard to this option.

22, 1985, respondents' filing of their petition on June 24, 1985, was timely. (§ 21167, subd. (a).)[3] The essence of its argument is that the project began at the latest on April 9, 1984—approximately 16 months before the petition was filed—when the Legislature mandated that CDFA begin a program for detecting and eradicating the AMFF. (Sen. Bill No. 2076 (1983-1984 Reg. Sess.); Stats. 1984, ch. 77.) We agree with the trial court's determination that the actions undertaken by CDFA in 1984 were directed at investigating the *feasibility* of embarking on an eradication program, while those undertaken in 1985 were an implementation of the 1984 findings involving distinct considerations, funding and procedures.

Senate Bill No. 2076 directed CDFA to (1) detect the range of the AMFF in California; (2) reduce the likelihood of a southward spread of the pest by controlling the movement of apples; and (3) create a buffer zone around areas in which small infestations of the AMFF were detected through eradication. (Stats. 1984, ch. 77, § 5.) CDFA was further instructed to prepare a report on its efforts, including "a determination on whether the apple maggot in this state is an eradicable or a controllable pest." (Stats. 1984, ch. 77, § 6.) Importantly, though the bill appropriated about $645,000 for the carrying out of these duties during the 1983-1984 fiscal year and close to $1,060,000 for 1984-1985, spending of the latter sum was made expressly dependent upon a determination that eradication of the AMFF was, in fact, *possible*. (Stats. 1984, ch. 77, §§ 7-8.) In its own report dated December 1984 CDFA recognized that the purpose of its project as authorized by Senate Bill No. 2076 was "to make a recommendation to the Legislature as to whether the Department should *attempt eradication* or *recommend* an on-going control program, *if feasible.*" (Italics added.)

CDFA's activities with regard to the AMFF in 1984 differed substantially from those proposed for 1985 in three important areas: funding, range and compliance. Having been allocated over $1 million in 1984 to determine whether or not eradication of the AMFF was feasible, the department concluded that it was possible to do so if given a budget of $15.2 million spread over seven years, with $2.6 million allocated to 1985. CDFA was given

---

[3]Section 21167, subdivision (a), states: "An action or proceeding alleging that a public agency is carrying out or has approved a project which may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days after commencement of the project."

"[S]ubdivision (a) pertains to an action charging the public agency with approving or undertaking a project having a significant effect on the environment without any attempt to comply with CEQA . . . ." (*International Longshoremen's & Warehousemen's Union* v. *Board of Supervisors* (1981) 116 Cal.App.3d 265, 271 [171 Cal.Rptr. 875].)

precisely this amount in Senate Bill No. 354 (1985-1986 Reg. Sess.) which took effect on July 22, 1985. (Stats. 1985, ch. 228.) Detection-trapping, quarantine and spraying activities were limited in 1984 to six northern California counties (Del Norte, Humboldt, Shasta, Siskiyou, Trinity and Mendocino), while the 1985 "apple maggot action plan" was to be expanded statewide. Most pertinent to respondents herein, in 1984 organic growers were subject to spraying only if an AMFF was discovered within one-quarter mile of their orchard and, even at that, they "still had the option of alternative treatments such as cold storage, processing, etc." In 1985 a finding within *five miles* triggered spraying and *no* alternative to treatment with "Imidan" was offered.

The trial court's factual determination that CDFA's 1985 eradication project was independent of its 1984 feasibility study is amply supported by the record and, therefore, will not be disturbed on appeal. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Moreover, CDFA admitted in its answer to the petition that it first publicly announced its intention to undertake the 1985 project on June 12, 1985. The trial court correctly concluded that respondents' filing their action 12 days later (on June 24, 1985) was timely for purposes of section 21167, subdivision (a).[4]

## II. *AMFF Eradication a "Discretionary Project" Under CEQA*

Section 21080 provides, in pertinent part, "this division shall apply to discretionary projects proposed to be carried out or approved by public agencies . . . ." (Subd. (a).) Specifically exempted from CEQA are "[m]inisterial projects proposed to be carried out or approved by public agencies." (Subd. (b)(1).) ▮ Appellants argue that since the Legislature in 1984 (through Senate Bill No. 2076) *mandated* that CDFA "create a buffer zone in which small infestations of the [AMFF] are detected and eradicated" (Stats. 1984, ch. 77, § 5) from that point on its duties with regard to the pest were purely ministerial. We disagree with this characterization.

Title 14, California Administrative Code, section 15357 defines a discretionary project as one "which *requires the exercise of judgment or deliberation* when the public agency or body *decides to approve or disapprove a particular activity,* as distinguished from situations where the public agency or body merely has to determine whether there has been conformity

---

[4]We have also considered appellants' argument that the trial court should have found the equitable doctrine of laches applicable, but find it to be without merit.

with applicable statutes, ordinances, or regulations." (Italics added.) Title 14, section 15369, notes that "'Ministerial' describes a governmental decision involving little or no personal judgment by the public official *as to the wisdom or manner* of carrying out the project. The public official merely applies the law to the facts as presented but *uses no special discretion or judgment* in reaching a decision." (Italics added.) ■ Section 21080 extends the scope of CEQA to hybrid projects of a mixed ministerial-discretionary character and where there are doubts whether a project is ministerial or discretionary, they should be resolved in favor of the latter characterization. (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 970 [131 Cal.Rptr. 172].)

■ While it is true that section 5 of Senate Bill No. 2076 mandated detection of the AMFF, reduction of its further spread and the creation of a "buffer zone," in section 6 the bill ordered CDFA to "prepare a report on the *status* of its efforts to carry out the requirements of Section 5 . . . ." (Stats. 1984, ch. 77, §§ 5–6, italics added.) The report was to "include a *determination* on *whether* the apple maggot in this state is an eradicable or a controllable pest." (*Ibid.,* italics added.) When submitted (in Dec. 1984) the report proposed three separate options for proceeding, one of which was titled "no action—discontinue the AMFF project." Moreover, in a document published in July 1985 CDFA listed five separate alternatives it had considered (including the "Prokopy method" advanced by respondents) before electing the spraying of "Imidan," giving also its conclusions as to why the four measures it rejected had been deemed ineffective.

Having made the final determinations as to whether or not it was feasible to eradicate the AMFF and what method would be most effective in doing so, CDFA cannot validly claim that it was performing purely ministerial functions. The 1985 project was discretionary within the meaning of section 21080, subdivision (a), and therefore subject to regulation under CEQA.

### III. *Exemption From EIR Requirement Not Demonstrated by Appellants*

Section 21100 states, "All state agencies, boards, and commissions shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they propose to carry out or approve which may have a significant effect on the environment." ■ Our Supreme Court has held that an agency should prepare an EIR whenever (1) it perceives some substantial evidence that the project may have a significant effect environmentally, or (2) the action *arguably* will have an *adverse* environmental impact. (*No Oil, Inc.* v. *City of Los Angeles* (1974)

13 Cal.3d 68, 85 [118 Cal.Rptr. 34, 529 P.2d 66].) Section 21080, subdivision (c), provides that where a lead agency determines there is no substantial evidence its proposed project will have a significant effect on the environment, it may exempt the project from CEQA provisions by preparing a "negative declaration" to that effect. Another possible exemption is found in section 21080.5, which provides that in specified areas of activity, when an agency has an approved regulatory program requiring information essentially duplicative of that which would be included in an EIR, written documentation of compliance with such regulatory program may be submitted in lieu of the EIR for the covered activity.[5]

 In opposing the petition below CDFA made no claim that it had prepared an adequate EIR or a negative declaration, but others claimed that its AMFF eradication activities fell under the limited exemption created by section 21080.5. The court below explicitly ruled "this eradication project of CDFA is not exempted by the 'functional equivalent' of section 21080.5 . . . ." In reviewing this finding, we must consider section 21080.5 not as it read at the time of the trial court's judgment, but as it reads today. For, on appeal from a judgment granting injunctive relief or relief in mandamus, the law to be applied is that which is current at the time of decision in the appellate court. (*Professional Engineers in Cal. Government* v. *Department of Transportation* (1980) 114 Cal.App.3d 93, 96 [170 Cal.Rptr. 444]; *Callie* v. *Board of Supervisors* (1969) 1 Cal.App.3d 13, 18-19 [81 Cal.Rptr. 440].)

 On two occasions since judgment was rendered in this case (July 25, 1985), both section 21080.5 and division 4, chapter 1.5, of the Food and Agricultural Code (Pest Control and Eradication Challenges—§§ 5051–5064) have been amended in a way that directly affects the trial court's ruling. To begin with, on September 30, 1985, subdivision (k) was added

---

[5]At the time of the trial court's decision section 21080.5 stated in relevant part: "(a) When the regulatory program of a state agency, board, or commission requires a plan or other written documentation, containing environmental information and complying with the requirements of paragraph (3) of subdivision (d), to be submitted in support of any of the activities listed in subdivision (b), the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division; provided, that the Secretary of the Resources Agency has certified the regulatory program pursuant to this section. [¶] (b) This section shall apply only to regulatory programs or portions thereof which involved either of the following: [¶] (1) The issuance to a person of a lease, permit, license, certificate, or other entitlement for use. [¶] (2) the adoption or approval of standards, rules, regulations, or plans for use in the regulatory program. . . . [¶] [d](3) The plan or other written documentation required by the regulatory program shall: [¶] (i) Include a description of the proposed activity with alternatives to the activity, and mitigation measures to minimize any significant adverse environmental impact. [¶] (ii) Be available for a reasonable time for review and comment by other public agencies and the general public."

to section 21080.5 to read: "Any program for the regulation of pesticides certified pursuant to this section and Chapter 308 of the Statutes of 1978 shall apply to the use of pesticides by any state agency acting under authority of Divisions 4 (commencing with Section 5001) and 5 (commencing with Section 9101) of the Food and Agricultural Code in eradicating or controlling a plant or animal pest." (Stats. 1985, ch. 1282, § 4.)

Appellants have identified CDFA's pesticide regulatory program as being contained in California Administrative Code, title 3, section 6100 et seq., and have demonstrated that in 1980 it was certified by the Secretary of the Resources Agency. (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 481 [204 Cal.Rptr. 897, 683 P.2d 1150].) Moreover, it is clear that CDFA was acting under Food and Agricultural Code, division 4, in embarking on its AMFF control and eradication program.[6] Therefore, in light of the legislation in effect today, we must conclude that the trial court was incorrect in determining that section 21080.5 was not applicable to the question of whether or not CDFA erred in failing to prepare an EIR.

This, however, does not end our inquiry. Food and Agricultural Code sections 5051 through 5064 were added at the same time that subdivision (k) made section 21080.5 directly applicable to pest eradication projects. (Stats. 1985, ch. 1282, §§ 1-4.) Food and Agricultural Code section 5054, as recently amended (Stats. 1986, ch. 20, § 1), states that a trial court's determination of a challenge to a CDFA project is governed by Food and Agricultural Code section 5053. (Code Civ. Proc., § 1085.5.) Section 5053 provides, "The court's inquiry shall extend only to whether there was a prejudicial abuse of discretion. An abuse of discretion shall be found if the decision was arbitrary or capricious *or the director did not proceed in the manner required by law.*" (Italics added.) Significantly, though it cited different statutes, the trial court *did* apply this standard and its precise ruling was, "since [CDFA has] failed to proceed in the manner required by law a prejudicial abuse of discretion is established."

We find that in spite of section 21080.5 now being explicitly applicable to pest eradication projects undertaken by CDFA, the trial court's determination that the agency failed to proceed in the manner required by law

---

[6]Food and Agricultural Code division 4, article 2, section 5321 provides: "If the director receives information of the existence of any pest which is not generally distributed within this state, he shall thoroughly investigate the existence and probability of its spread, and the feasibility of its control or eradication."

Food and Agricultural Code division 4, article 2, section 5322 provides: "The director may establish, maintain, and enforce quarantine, eradication, and such other regulations as are in his or her opinion necessary to circumscribe and exterminate or prevent the spread of any pest which is described in Section 5321."

remains correct. First of all, under section 21080.5, subdivision (a), an agency may only exempt the use of a given material from the requirement of preparing an EIR when *in lieu* of an EIR the agency submits a *plan or other written documentation* prepared in accordance with its certified regulatory program. This document must have been made available to the public for comment and must include a description of the proposed activity, including alternatives and mitigating measures to minimize any significant environmental impact. (See § 21080.5, subd. (d)(3).)

We conclude that CDFA never made the required showing. In a request for additional briefing we asked the parties herein to discuss whether or not CDFA had provided the court below with evidence that it complied with the dictates of section 21080.5. Appellant admitted in response, that the record *does not* contain evidence that "Imidan" is registered and independently evaluated by CDFA. Though appellant "asserted" that it had complied with the procedural requirements of its own regulatory program, it provided no citation to anything *in the record* which could support this contention. Since, in the proceedings below, appellant dedicated a substantial portion of its effort to arguing that the AMFF project was exempted from CEQA by section 21080.5, we assume that if appellants could have provided the written documentation required under that statute they would have done so.

An analysis of CDFA's own pesticide regulatory program demonstrates how proving that a material has been properly registered for its proposed use is essential to effecting section 21080.5's goal of promoting timely application of pesticides, yet assuring that CEQA protections are not compromised. (Stats. 1978, ch. 308, §§ 1–5.) CDFA's standards of review and evaluation state that before allowing a pesticide to be registered for a proposed use, the director must consider all feasible alternatives and make a written determination that *any* significant adverse impact (such as health dangers, potential for environmental damage and toxicity to wildlife) is outweighed by the anticipated benefit. (Cal. Admin. Code, tit. 3, § 6158.) Even where a pesticide has been previously registered, if any *new major use* is proposed, such as use on a crop for which it was not previously evaluated, a separate registration must be obtained. (Cal. Admin. Code, tit. 3, §§ 6151, 6181, 6189.) In addition, a pesticide's registration may be reevaluated at any time upon discovery of new adverse effects, or information that a new alternative has become available. (Cal. Admin. Code, tit. 3, §§ 6220–6222.) Therefore, in this case no "functional equivalent" to an EIR is effected under section 21080.5 absent a showing that "Imidan's" registration (1) is up to date, and (2) contemplates the pesticide being sprayed

statewide on all possible hosts, for up to the seven-year period being proposed by appellants.

Even assuming that CDFA could have demonstrated such registration to the trial court's satisfaction, we would nonetheless agree that appellant failed to proceed as required by law. Food and Agricultural Code section 5051 states: "Whenever the director exercises authority on a control or eradication project pursuant to [div. 4] . . . a written decision describing the proposed action shall be adopted and *shall contain findings as to the need for the action,* the statutory basis for that action, and notification that any action challenging the decision shall be brought within 30 days. The decision shall be a public record, available to the public upon request, *shall be published in a newspaper of general circulation in the county,* and shall be filed with the governing body of any affected city, county, or city and county in accordance with the procedures set forth in Section 21152 of the Public Resources Code. Any addition to or expansion of a declared treatment area shall also comply with the requirements of this section." (Italics added.)

The reference in this statute to section 21152 is extremely important because it shows that the Legislature intended the decision whether or not to *proceed* with an eradication or control project to remain subject to CEQA guidelines. Section 21152, subdivision (a), provides that when an agency files notice saying it intends to carry out a project covered under CEQA, "The notice shall indicate the determination of the local agency *whether the project will, or will not, have a significant effect on the environment and shall indicate whether an environmental impact report has been prepared* pursuant to this division. The notice shall also include certification that the final environmental impact report with comments and responses, if one was prepared, is available to the general public." (Italics added.) Likewise, subdivision (b) specifies procedures to be followed for the certification and filing of a determination that an agency project is *not* subject to CEQA.

Also important to our consideration is the fact that two of the major statutes designed to eliminate duplicative environmental study in pest eradication projects were amended on March 17, 1986, in a manner which restricts their applicability. Section 21080.5, subdivision (k), now provides that a certified regulatory program can take the place of an EIR where CDFA is using a properly registered pesticide "in eradicating a plant or animal pest." (Stats. 1986, ch. 20, § 4.) Previously, the subdivision read, "in eradicating *or controlling* a plant or animal pest." (Italics added.) Food and Agricultural Code section 5054 originally stated directly, that it would not be an abuse of discretion for the director to make use of a properly registered

pesticide as part of an eradication effort. Today, that section ends with the statement, "nothing herein shall *limit review* of a decision of the director *to proceed* with a control or eradication project." (Stats. 1986, ch. 20, § 1, italics added.)

We therefore conclude that even when reviewed in light of recent statutes designed to speed up eradication efforts, appellants' 1985 project suffered from what the trial court labeled "the failure of CDFA to address the controversy, to allow public input and opposing views in its 'equivalent function' approach." Even if CDFA believed its decision to utilize "Imidan" would be exempt from CEQA under section 21080.5, it was obliged to follow the EIR process with regard to its choice of *proceeding* with the AMFF project. It must be recalled that the 1985 program involved not only the application of a pesticide, but also the detection of the AMFF through trapping, the imposing of quarantines to limit distribution of infected fruit, and the spraying of properties without taking into account a landowner's peculiar needs or objections. Had CDFA felt that no aspect of its program other than using "Imidan" was likely to have a significant impact on the environment, it should have issued a negative declaration to that effect. (§ 21080, subd. (c).) That way, the public would at least have been given notice of the proposed action (§ 21092) and, most likely, an opportunity for public hearing as well. (*Plaggmier* v. *City of San Jose* (1980) 101 Cal.App.3d 842, 853-854 [161 Cal.Rptr. 886].)

As stated by the court in *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 819 [176 Cal.Rptr. 342], compliance with the EIR provisions of CEQA serves a more important function than providing the public with a detailed analysis of a project, its likely effect on the environment and alternatives which may be available. It also demonstrates to an apprehensive citizenry that the responsible public agency has considered the ecological implications of its action and correspondingly makes elected and appointed officials accountable for their environmental values. CDFA's attempt to embark on a seven-year, multimillion-dollar pest eradication and control project absent any compliance with CEQA other than its alleged use of a properly registered pesticide served none of these salutary purposes.[7]

---

[7]Without reaching the merits of appellants' claim that the trial court erred in allowing introduction of evidence on the date of the hearing, we find that this could not have prejudiced CDFA's case. The court below properly found an abuse of discretion in appellants' failure to proceed in the manner required by law. This omission was established by CDFA's own administrative record.

Whether or not the trial court erred in finding that CDFA was required to obtain inspection warrants (Code Civ. Proc., §§ 1822.50–1822.55), before spraying trees of objecting property

The judgment ordering issuance of the peremptory writ of mandate and granting the preliminary injunction is affirmed. However, since CDFA did not begin the EIR process within 10 days of the court's decision, only those portions of the judgment ordering appellants to cease all activity against the AMFF in California until it complies with CEQA and enjoining it from spraying any toxic pesticide on private property, where objected to by the owner or occupant, remain in effect.

Poché, J., and Channell, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 11, 1987.

---

owners, is not an issue cognizable in this appeal. The trial court's sole determination of this matter is found within its "ruling," which is nothing more than a statement of decision. The judgment ordering the peremptory writ of mandate and granting the preliminary injunction provides *no* relief to respondents with regard to inspection warrants.

Finally, appellants' complaint that the trial court's "fashioning of interim relief" violated section 21168.9 is moot. In essence, the court ruled that if CDFA chose to commence the EIR process in good faith within 10 days of the judgment, it could continue spraying the properties of nonobjecting landowners, while forcing those who did object to pursue alternative, nonchemical control methods. CDFA did not begin the EIR process within the specified time; therefore, upon our rendering a judgment in this case the automatic stay on the writ of mandate will be lifted, and CDFA will have to suspend *all* activities begun as part of its AMFF eradication project.