[No. A107088. First Dist., Div. Four. Dec. 29, 2005.]

CALIFORNIANS FOR ALTERNATIVES TO TOXICS et al., Plaintiffs and Appellants, v.
DEPARTMENT OF FOOD AND AGRICULTURE, Defendant and Respondent;
CALIFORNIA ASSOCIATION OF WINEGRAPE GROWERS et al., Interveners and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*The requests for publication of this court's December 29, 2005 opinion are granted and it is hereby ordered that said opinion, with the exception of parts II.B.4. and II.C.–G., be published in the Official Reports.

4

## COUNSEL

Law Offices of Sharon E. Duggan, Sharon E. Duggan; Wild Earth Advocates and Julia Olson for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Tom Greene and Mary E. Hackenbracht, Assistant Attorneys General, John Davidson and Michael W. Neville, Deputy Attorneys General, for Defendant and Respondent.

Kahn, Soares & Conway, Dale A. Stern and Alison R. Sigel for Interveners and Respondents.

Wendell Lee for Wine Institute as Amicus Curiae on behalf of Interveners and Respondents.

## OPINION

**REARDON, Acting P. J.**—There is no doubt that the glassy-winged sharp-shooter (GWS), a primary vector of Pierce's disease to crops in this state, is a threat to California agriculture, especially grapevines. Winegrape production in California has a total direct and indirect annual impact on the state's economy in excess of $33 billion. (Food & Agr. Code, § 6292, subd. (c).)

Respondent California Department of Food and Agriculture (DFA) began operating an emergency program to control Pierce's disease and the GWS in 2000. In May 2003 the DFA certified a final environmental impact report for a permanent Pierce's Disease Control Program (PDCP). A key component of the program calls for the use of pesticides to control and eradicate the GWS.

■ This appeal arises under the California Environmental Quality Act (CEQA). (Pub. Resources Code,[1] § 21000 et seq.) It raises the question whether a lead agency such as DFA can forgo environmental analysis of the use of pesticide products in the program by relying on the certified regulatory and registration program operated by the California Department of Pesticide Regulation (DPR). We conclude it cannot and for this and related reasons reverse the judgment.

## I. FACTUAL BACKGROUND

### A. *The Peril and the Program*

The GWS is a nonnative insect of the leafhopper family that probably established itself in California in the late 1980's, but was first reported here in 1994. It is an aggressive flyer, traveling greater distances than native sharpshooters.

Pierce's disease, present in this state for more than 100 years, is caused by a strain of the bacterium Xylella fastidiosa (X. fastidiosa). The disease kills grapevines by clogging their water-conducting vessels (xylem). Native species of sharpshooters have not succeeded in spreading the disease as far and wide as the GWS because they are poor fliers and their habitat primarily is adjacent to waterways. Moreover, even where the disease is present in a vineyard, vine-to-vine transmission is minimal because the native sharpshooter does not travel far and has limited ability to spread the disease because of its small mouth size.

On the other hand, the GWS feeds on xylem fluid of numerous plants and thus spreads Pierce's disease through its feeding habits. Further, the GWS is prolific, building to high populations on an array of host plants, thereby substantially increasing the number of insects vectoring the X. fastidiosa bacteria to crops. And in a vineyard setting it transfers the bacteria vine to vine, exponentially increasing the disease incidence in that setting.

The destructive combination of Pierce's disease vectored by the GWS in vineyards was observed in Riverside County in August 1999, when more than 300 acres of grapevines infested with the GWS were destroyed by the disease. The next year the Legislature enacted emergency legislation aimed at combating Pierce's disease and its vectors,[2] declaring that they "present a clear and present danger to California's fifty billion dollar grape industry . . . ."

---

[1] Unless otherwise noted, all statutory references are to the Public Resources Code.

[2] Food and Agricultural Code sections 6045–6057; Statutes 2000, chapter 21, section 1, effective May 19, 2000.

(Food & Agr. Code, § 6045, subd. (a).) The emergency provisions established the PDCP within the DFA; directed the Governor to appoint a statewide coordinator to fight the disease and its vectors; appropriated funds for the program including funds for local public entities that develop Pierce's disease workplans as specified in the legislation; and authorized the secretary of DFA to establish, maintain and enforce a regulatory program to interpret, clarify and implement the PDCP. (*Id.*, §§ 6046–6047.)

In July 2000 the DFA adopted emergency regulations for (1) designating areas as infested or noninfested with the GWS and (2) inspecting shipments of bulk grapes and other commodities and disposing of infected shipments; and set standards for movement of nursery stock and bulk grapes. (Cal. Code Regs., tit. 3, §§ 3650–3660.) These regulations implement a statewide response program for arresting the spread of the GWS and, where feasible, eradicating it upon detection in noninfested areas.

The DFA is the agency charged with coordinating the statewide program. The county agricultural commissioner or other designated body is responsible for local implementation, with coordination by DFA. Because the emergency regulations and program were created in response to an emergency, they were exempt from CEQA. (Cal. Code Regs., tit. 14, § 15269, subd. (c).) Taking the next step, the DFA proposed continuation of the emergency program as a long-term program, with attendant regulations, and acting as lead agency, submitted the proposed program for environmental evaluation.

B.  *Draft Environmental Impact Report*

DFA issued its notice of preparation of an environmental impact report (EIR) for the permanent PDCP in March 2001. Approximately a year later, following a period of public comment, DFA issued its draft EIR (DEIR).

1. *Program Elements*: The DEIR set forth five elements of the PDCP: public outreach; a statewide survey; containment of the spread; local management/rapid response; and research. In infested counties in Southern California, the DEIR identified the goal of the program as containment rather than eradication. In Northern California, where the GWS is not generally established, the goal would be local eradication.

a. *Public Outreach*: The purpose of the public outreach component is to raise public awareness about Pierce's disease, the GWS and the combined threat they pose in this state. The idea is that with increased public awareness would come involvement, earlier detection and reduced damage. Outreach would be accomplished through a variety of efforts, including the PDCP Web site, dissemination of general and technical information, informational public meetings, press releases and networking.

b. *Statewide Survey*: This element is intended to locate and monitor GWS infestations and populations. Statewide surveys would be conducted annually. In nonagricultural and cropland areas, detection activities would take place from March or April through October, whereas in nurseries, detection activities would occur year round.

c. *Containment*: This component of the PDCP seeks to prevent or retard the spread of the GWS by regulating the movement of commodities which may harbor the GWS and through biological and other control measures. Regulations setting forth standards and protocols for moving and shipping bulk grapes, bulk citrus and nursery stock would continue to be enforced under the permanent PDCP. Biological control measures would include release of natural enemies of the GWS such as a native tiny, stingless parasitic wasp which parasitizes sharpshooter eggs. There would be an evaluation process for importing nonnative natural enemies which would include an assessment of rearing activities and trial releases, and analysis of potential undesirable effects of these biological control agents such as whether the agent would adversely impact other organisms, e.g., native insects.

d. *Rapid Response*: The rapid response component focuses on immediate action to minimize the spread of a newly discovered GWS infestation, defined as "five or more adults within any five day period within a 300 yard radius of each other, or the presence of multiple life stages (e.g., adults, nymphs, and eggs)." As soon as there is discovery of a GWS in one or more life stages that is not associated with a recent shipment of regulated commodities, the county agricultural commissioner conducts a property-by-property visual survey for the presence of the GWS. The delimitation survey area encompasses all properties within one-quarter mile of the GWS find, with each newly infested property serving as the center of another one-quarter mile radius.

With the discovery of a new infestation, there is consultation with the California Department of Fish and Game (DFG), the United States Fish and Wildlife Service (U.S. Fish and Wildlife) and, where appropriate, the National Marine Fisheries Service (Marine Fisheries). DFA has entered into memoranda of understanding with DFG and U.S. Fish and Wildlife detailing a communication process for notification of pest control activities and development of measures to avoid adverse environmental impacts.[3] If DFG or U.S. Fish and Wildlife concludes that proposed PDCP activities would pose a potential jeopardy to threatened or endangered species or species of concern, the agencies would develop appropriate measures to avoid jeopardy.

---

[3] Although DFA does not have a memorandum of understanding with Marine Fisheries, there is a coordination program with that entity and an informal arrangement to discuss activities that might impact marine mammals, coastlines, or streams that empty into the ocean.

The next step is treatment of infested properties. The county agricultural commissioner proceeds according to established protocols. In Southern California where the goal is containment, rapid response activities would be limited. Commissioners might coordinate vegetation host removal on abandoned cropland or roadsides and, at their discretion, growers may apply pesticides on their property.

The goal in Northern California is eradication, typically through the use of pesticides, applied by ground treatment in nonagricultural areas. Host removal could also occur.

Registered pesticides used under the emergency program most likely would continue as the primary pesticides for rapid response. These include carbaryl (Sevin; "7") and cyfluthrin (Tempo) as foliar sprays and imidacloprid (Merit) as a foliar spray or applied as soil drench or soil injection. Other pesticides registered for use against leafhoppers could be applied if information suggests a benefit such as reduced risk.

Prior to initiating a course of treatment in a nonagricultural area, the county agricultural commissioner would convene public outreach meetings in the affected area. As well, occupants of all properties subject to treatment would be notified of the pending application. Administrators of schools, rest homes, hospitals and day care centers near treatment areas would also be notified.

County agricultural commissioners may also require growers to treat their crops with registered pesticides suitable for controlling leafhoppers. The efficacy of control methods appropriate for organic growers is being evaluated by DFA. According to the DEIR, trial releases of biological control agents have not been as effective as pesticides and therefore are not recommended.

The proposed PDCP also provides for posttreatment evaluation and includes protocols for environmental monitoring of pesticide treatments and treatment areas, including monitoring of residue levels.

e. *Research*: The research effort described in the DEIR is collaborative, with over 40 scientists working on more than 60 projects. Funded research has focused on ascertaining the tools needed to reduce the spread of the GWS, including the use of biological control agents; learning how the GWS selects host plants, analyzing the epidemiology of Pierce's disease and determining if cultural practices can reduce infection rates; and developing plant resistance to the disease.

2. *Alternatives*: The DEIR sets forth several alternatives: a no-project alternative and three action alternatives, each of which would regulate

movement of commodities that may cause the spread of the GWS. For alternative A, the DFA would not take any action against new GWS infestations. Under alternative B, new infestations would be abated on agricultural lands, using the most effective treatments available. Under alternative C, the DFA would abate all new infestations outside of the generally infested areas, but would not use conventional pesticides in nonagricultural areas.

3. *Environmental Impacts*: The DEIR also identifies potential environmental impacts. These include loss of wild and hobby-kept bees; loss of some beneficial insect species; temporary withdrawal of organic certification for growers; surface water impacts from the use of pesticides; potential exposure to pesticide residues on the part of agricultural and nursery workers as well as fragile populations (the acutely ill, very young or old, or pregnant women) and other persons in nonagricultural areas who come into contact with residues through skin contact, inhalation, etc. Notwithstanding these potential impacts, the report concluded that attendant safeguards within the PDCP reduced all such impacts to less than significant and therefore no additional mitigation measures were proposed. Determining there would be no harm to human health or the environment from the application of pesticides, the DFA relied on state and federal pesticide registrations. Likewise, DFA relied on licensing and worker safety regulations in deciding that exposure to pesticides did not constitute a significant impact for pesticide applicators and agricultural workers.

## C.   Comments on DEIR

Appellants[4] and others submitted comments critical of the DEIR. Appellants criticized the DEIR's reliance on compliance with existing pesticide regulations as adequate to protect human health. They also faulted the DEIR's risk evaluations of carbaryl, pyrethroids and imidicloprid, as well as its failure to address the issue of impacts of additives in pesticide formulations.

Appellants also condemned the report for its purported lack of disclosure and inadequate risk assessment of impacts of pesticides on sensitive populations (as well as the deficient consideration of mitigation measures). Further, they objected to statements in the DEIR sanctioning the deferred analysis of impacts on endangered species. Appellants also disputed the DEIR's findings that impacts from pesticide use on pest management programs and organic farming would be less than significant. Appellants also faulted the DEIR's cumulative impacts assessment.

---

[4] Appellants herein are Californians for Alternatives to Toxics, Public Employees for Environmental Responsibility, and People Opposed to Insecticide Spraying on Neighborhoods.

Appellants found the DEIR's cumulative impacts assessment and range of alternatives inadequate, and observed that integrated pest management (IPM) should have been treated as a viable alternative. Nor, according to appellants, did the DEIR evaluate how alternatives to pesticides might be used in combination with one another or in conjunction with conventional pesticides.

Finally, appellants asserted that the DEIR should not be certified because it failed to evaluate mitigation measures that could minimize significant impacts detailed in their comments.

The California Regional Water Quality Control Board, North Coast Region commented that "[t]he potential for run-off of pesticides into waterbodies exists, even when the pesticides are applied by licensed pesticide applicators according to label directions." It suggested a no-spray riparian buffer zone in mitigation, as well as ground water monitoring and measures that would mitigate for weather conditions.

D.  *Final EIR*

DFA issued the final EIR in May 2003. It concluded: "Commenters did not identify any new significant environmental impacts not addressed in the EIR." Changes from the DEIR were minimal.

E.  *Litigation*

Appellants filed this lawsuit in June 2003. Respondents California Association of Winegrape Growers and Family Winemakers of California were allowed to intervene. This appeal followed the denial of appellants' petition for writ of mandate and request for injunctive relief.

## II.  DISCUSSION

A.  *Standard of Review*

■ CEQA embodies the fundamental legislative intent that the act be interpreted in a manner that affords the fullest possible protection to our environment within the reasonable scope of the statutory language. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 563–564 [276 Cal.Rptr. 410, 801 P.2d 1161].) "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental

changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) Thus, the EIR is an accountability document and the EIR process itself protects the environment as well as informed decisionmaking. (*Ibid.*)

Judicial review under CEQA generally is limited to ascertaining whether the lead agency abused its discretion by not proceeding as required by law, or by making a determination that is not supported by substantial evidence. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 688 [125 Cal.Rptr.2d 745].) An agency fails to proceed in a manner required by law and thus abuses its discretion when it does not comply with the informational requirements of CEQA. Harmless error analysis is inapplicable in these circumstances. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1105–1106 [11 Cal.Rptr.3d 104].) Under the substantial evidence test, we resolve reasonable doubts in favor of administrative findings and decision. Thus, we will not overturn an agency's approval of an EIR because an opposite conclusion would have been equally or more reasonable. Nor do we weigh conflicting evidence and determine who has the better argument. (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1356 [111 Cal.Rptr.2d 598].)

B.  *The EIR's Evaluation of Environmental Impacts from Application of Pesticides Under the PDCP Is Inadequate*

1.  *Introduction*

Appellants are adamant that DFA did not independently evaluate the impacts of the PDCP's proposed statewide use of multiple pesticides. Instead, they argue DFA impermissibly relied solely on the certified regulatory program of the DPR to conclude that there were *no significant adverse impacts.*

■  "The purpose of an [EIR] is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a).) CEQA defines "significant effect on the environment" as "a substantial, or potentially substantial, adverse change in the environment." (§ 21068; see § 21000, subd. (d).) The term "environment"

refers to "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna . . . ." (§ 21060.5.)

■ The DFA, as lead agency for the PDCP, is charged with considering, discussing and analyzing the environmental impacts of the proposed program, taking into account all phases of the program when evaluating its effect on the environment. (§ 21100, subd. (a); Guidelines,[5] § 15126.) As a general matter the EIR must present facts and analysis, not simply the bare conclusions or opinions of the agency. (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 568.) The discussion of impacts is acceptable if it provides sufficient information and analysis to allow the public to discern the basis for the agency's impact findings. (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397 [133 Cal.Rptr.2d 718].) Thus the EIR should set forth specific data, as needed to meaningfully assess whether the proposed activities would result in significant impacts. (See *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs., supra,* 91 Cal.App.4th at pp. 1381–1382.) DFA's impact analysis fell far short of these standards.

### 2. *Department of Pesticide Regulation*

In order to fully appreciate appellants' argument, we first examine DPR's mission and role in regulating pesticide use in this state.

■ The DPR has broad authority to regulate the registration and classification of pesticides and promulgate regulations and standards for monitoring the effects of pesticide use. The agency administers a pervasive pesticide regulatory scheme governing all aspects of registration, sales, possession and use of pesticides in California. (Food & Agr. Code, § 12811 et seq.)

■ CEQA authorizes state agencies such as DPR, operating pursuant to their own regulatory program, to generate a plan or other environmental review document which functions as the equivalent of an EIR. (§ 21080.5; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 115 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) The plan required by the regulatory program must include a description of the proposed activity with alternatives and mitigation measures to minimize any significant adverse effects on the environment. (§ 21080.5, subd. (d)(3)(A).) As well, the plan must be available for public review and comment. (*Id.,* subd. (d)(3)(B).)

The secretary of the resources agency has certified the pesticide regulatory program administered by DPR and the county agricultural commissioners as

---

[5] All references to "Guidelines" are to the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq.)

14

meeting the requirements of section 21080.5 with respect to (1) the registration, evaluation and classification of pesticides; (2) the adoption, amendment or repeal of regulations and standards for licensing and regulating pesticide dealers and pest control operators and advisors; (3) the adoption, amendment or repeal of regulations for standards dealing with the monitoring of pesticides and of the human health and environmental effects of pesticides; and (4) the regulation of pesticide use in agricultural and urban areas through the permit system administered by county agricultural commissioners. (Guidelines, § 15251, subd. (i)(1)–(4).)

■ Food and Agricultural Code section 12824 is a key provision requiring that pesticides be evaluated and registered prior to being sold or used in this state. Pursuant to that statute, DPR is authorized to place appropriate restrictions on pesticide use. Pesticides for which renewal of registration is sought are also subject to thorough evaluation under Food and Agricultural Code section 12824. After registration, a registrant must submit to DPR any new evidence of a pesticide's adverse effect or risk to human health, livestock, crops or the environment. (*Id.*, § 12825.5.)

The registration process begins with submittal of the prescribed application (Cal. Code Regs., tit. 3, §§ 6270, 6170.5) and supporting data required by law. In addition to information submitted to the federal Environmental Protection Agency (EPA) in support of federal registration of the product (*id.*, §§ 6159, 6170), prospective registrants and, where appropriate, reregistrants must submit extensive data to the DPR. These requirements include general toxicity data (*id.*, § 6172); dermal absorption data (*id.*, § 6176) and dermal or inhalation exposure data (§ 6177), where applicable; a protocol for treatment of poisoning (*id.*, § 6178); acute toxicity data on certain spray adjuvants (*id.*, § 6179); biochemical data on rodenticides (*id.*, § 6180, subd. (a)); acceptable foliar and soil residue data where product is intended for use on commercially grown crops and there may be substantial exposure by field workers (*id.*, § 6181); an established safety reentry interval for proposed pesticide use that poses a safety hazard to field workers (*id.*, § 6182, subd. (a)); appropriate indoor exposure data where product may result in dermal or respiratory exposure after indoor application (*id.*, § 6183); a method and standard sample for accurately determining residues of active ingredients and certain metabolites (*id.*, § 6184); data supporting each efficacy claim (*id.*, § 6186); data indicating the product's acute chronic toxicity to bees where product may be likely to contact commercial apiaries or pollinating bees (*id.*, § 6187); data on viscosity of liquid pesticide product carrying the signal word "DANGER" on the label for an agricultural use (*id.*, § 6188); where registration is sought for use on crop for which product was not previously registered, data on any

adverse effect on pest management systems for that crop (*id.*, § 6189); in the discretion of the director of DPR (director), data regarding evaporative emission of volatile organic compounds contained in the product (*id.*, § 6191); and other data as the director determines necessary, which may include data on pesticide drift; phytotoxicity; environmental effects; analytical and environmental chemistry; and effect from use of mixtures of two or more products in combination; and contaminants in pesticide products (*id.*, § 6192).

■ With this data, the DPR undertakes a comprehensive analysis prior to determining whether to register a pesticide in the first instance. (Food & Agr. Code, §§ 12824, 12825.) During the review and evaluation of proposed labeling and data supporting registration, the director pays particular attention to the following factors in deciding whether or not to register the pesticide: acute health effects; evidence of chronic health effects; potential for environmental damage, including interference with attainment of applicable environmental standards (e.g., air quality standards, water quality objectives); toxicity to aquatic biota or wildlife; method of medical management of poisoning or other injuries; analytical methods; availability of feasible alternatives; and efficacy. If it is anticipated that any of these factors will result in significant adverse impacts which cannot be avoided or adequately mitigated, the director will not grant registration unless he or she makes a written finding that anticipated benefits clearly outweigh risks. (Cal. Code Regs., tit. 3, § 6158.)

Finally, DPR has broad discretion, after a hearing, to refuse to register, or cancel the registration of, any pesticide: "(a) That has demonstrated serious uncontrollable adverse effects either within or outside the agricultural environment. [¶] (b) The use of which is of less public value or greater detriment to the environment than the benefit received by its use. [¶] (c) For which there is a reasonable, effective, and practicable alternate material or procedure that is demonstrably less destructive to the environment. [¶] (d) That, when properly used, is detrimental to vegetation, except weeds, to domestic animals, or to the public health and safety. [¶] (e) That is of little or no value for the purpose for which it is intended." (Food & Agr. Code, § 12825, subds. (a)–(e).)

3. *Analysis*

a. *DPR Scheme Versus DFA's Duty*

In its discussion of potential environmental impacts, DFA reasoned that the DPR's multifaceted pesticide registration regulatory scheme ensured that proposed pesticide use under the PDCP would not result in any significant adverse environmental impacts. Appellants fault this state of affairs, asserting

that DFA abused its discretion by relying on DPR's regulatory scheme as a substitute for performing its own evaluation of the environmental impacts of using pesticides under the PDCP. We agree.

■ We acknowledge that DFA's duty under CEQA to analyze the effects of pesticide use must necessarily take into account the distinct regulatory scheme of the DPR. However, sole reliance on DPR's registration of pesticides and its regulatory program, including safety regulations for employees handling pesticides (Cal. Code Regs., tit. 3, § 6720 et seq.), is inadequate to address environmental concerns under CEQA. DFA is responsible for analyzing the environmental impacts of proposed pesticide use under the PDCP, notwithstanding that DPR must also register pesticides before they can be used in this state. DPR's registration does not and cannot account for specific uses of pesticides in the PDCP, such as the specific chemicals used, their amounts and frequency of use, specific sensitive areas targeted for application, and the like.

*Save Our Ecosystems v. Clark* (9th Cir. 1984) 747 F.2d 1240 is instructive. There, the United States Forest Service had determined that certain herbicides could properly be used for defoliation activities, relying solely on their Environmental Protection Agency (EPA) registration under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The Ninth Circuit Court of Appeals held that "[t]he EPA registration process for herbicides under FIFRA is inadequate to address environmental concerns under NEPA [National Environmental Policy Act] . . . ." Instead, an agency must conduct independent research on the safety of herbicides it proposes to use.[6] (*Save Our Ecosystems v. Clark, supra,* at p. 1248; see *Northwest Coal. for Altern. to Pesticides v. Lyng* (9th Cir. 1988) 844 F.2d 588, 596.) An agency can appropriately fulfill this duty of independent investigation by considering the registering agency's data on herbicides *in the specific context of the area targeted for proposed application.* (*Save Our Ecosystems v. Clark, supra,* 747 F.2d at p. 1247.)

Our review of the EIR reveals that DFA repeatedly deferred to the DPR regulatory scheme instead of analyzing environmental consequences of pesticide use and therefore fell short of its duty under CEQA to meaningfully consider the issues raised by the proposed project. (See *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715, 720–722 [131 Cal.Rptr.2d 186].)

---

[6] Judicial interpretations of the federal environmental regulatory scheme are persuasive authority on analogous CEQA questions. (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 565, fn. 4.)

By way of example, the EIR's "environmental analysis" section discusses the use of pesticides in nonagricultural areas, concluding as follows: "The U.S. EPA and [DPR] evaluate pesticides for potential effects on human health prior to registration and require appropriate use restrictions be present on the pesticide label to ensure a reasonable certainty of no harm to human health and the environment. [DPR's] pesticide registration process has been certified as meeting the requirements of CEQA. [Citation.] Professional application in compliance with pesticide labels ensures that pesticides used in the PDCP would not be detrimental to the public health and safety." Similar reliance on pesticide label restrictions and existing occupational health and worker safety regulations supported DFA's assessment that potential hazards to pesticide applicators and agricultural workers would be less than significant. As well, DFA concluded that applying pesticides consistent with label requirements would reduce potential water quality impacts to less than significant.

Likewise, in the appendix on the use of pesticides in the PDCP, DFA writes: "All [pesticide] applications must be in compliance with federal and state laws and regulations . . . . The [DPR] pesticide registration program was approved under [CEQA] as meeting the requirements of the Act with respect to environmental review of pesticide use. Therefore, the use of pesticides registered by [DPR] according to approved label directions is in compliance with CEQA."

■■■ These conclusory statements do not fit the CEQA bill. Compliance with the law is not enough to support a finding of no significant impact under the CEQA. (*Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 881–882 [274 Cal.Rptr. 720] [court rejected assertion that noise level under proposed project would be insignificant simply by virtue of being consistent with general plan standards for zone in question].) While *Oro Fino* did not involve a program certified as CEQA equivalent, its holding still pertains. The DPR program is in essence the master plan for pesticide registration, evaluation and regulation. It does not, nor was it intended to, address the environmental impacts of administering a statewide pesticide application program backed by the full force of the DFA and the county agricultural commissioners. Nor is there legal authority for the proposition that using registered pesticides according to their labels never results in significant adverse effects. (See *Oregon Environmental Council v. Kunzman* (9th Cir. 1983) 714 F.2d 901, 905 [reliance on pesticide registrations in lieu of analysis under federal environmental laws was improper because "[t]he licensing of pesticides containing carbaryl does not 'reflect a conclusion that a pesticide is safe under *any* conditions' "].)

b.  *DFA's Arguments*

DFA argues that it should not be required to duplicate the work of DPR. We do not expect duplication. However, we do expect the EIR or its appendices to *consider* the extensive DPR data on the pesticides proposed for application in the rapid response and containment elements of the PDCP. Regrettably, the administrative record does not contain *any* compilation of DPR's data. (See pt. II.B.1., *ante* [identifying type of data reviewed in pesticide registration].) Nor does it disclose DPR's environmental analysis or risk assessments with respect to these pesticide products. Hence we do not even have the functional equivalent of an EIR for the relevant pesticide registrations, let alone an environmental enquiry into their potential effects under the statewide PDCP program. (See *Citizens for Non-Toxic Pest Control v. Department of Food & Agriculture* (1986) 187 Cal.App.3d 1575, 1586–1587 [232 Cal.Rptr. 729] [in order to rely on CEQA exemption for pesticide regulatory program to excuse preparation of EIR before commencing spraying of "Imidian" to eradicate apple maggot fruit fly, there must be evidence in record that registration is up to date and "contemplates the pesticide being sprayed statewide on all possible hosts, for up to the seven-year period being proposed by appellants"].)

In lieu of a proper assessment and evaluation, what we have in the appendices are the product labels and material safety data sheets for pesticides used most frequently in the emergency program; a very general discourse of general principles related to chemical toxicology and risk evaluation; followed by brief summaries for three pesticides employed in the emergency program,[7] notwithstanding that the DEIR identified *30* active pesticide ingredients "that so far have passed CDFA's treatment selection process and might be used in non-agricultural settings in the PDCP." Moreover, these summaries only cursorily treat toxicology, behavior in the environment and human exposure experience. Further, they do not analyze how potential effects could impact people and the environment under the PDCP.

Given the potential adverse impacts to human health and the environment from a statewide program authorizing pesticide use in numerous settings that could expose humans, animal and aquatic life and surface water and air to pesticide residue, at a minimum the EIR should contain a serious risk assessment of *all* pesticides that could be used in the rapid response and containment programs of the PDCP.

As a contrasting example, the EIR for the vegetation control program of the California Department of Transportation (Caltrans) contains an appendix

---

[7] Continued use of these pesticides is contemplated under the permanent program.

devoted to risk assessment that is larger than the entire DEIR and appendices for the PDCP. It includes a quantitative risk assessment for each of the 25 herbicides used or proposed for use in the Caltrans program. This assessment evaluates the likelihood of the occurrence of adverse effects in humans and representative aquatic and terrestrial species that may result from herbicides used for vegetation management in California. The appendix presents herbicide-specific information on chemical/physical characteristics; use patterns within the state; fate and transport in the environment; potential toxicity to humans, animals and aquatic organisms; and estimates of risks to humans, animals and aquatic organisms under specified conditions of use. Tables detail the average and maximum estimates of (1) single day intake and associated estimates of noncancer risk; (2) lifetime average daily dose and associated estimates of cancer risk (where available); and (3) single day intake and associated estimates of ecological risk. Information related to humans is broken down according to exposure, e.g., to workers, and by manner of application; and to the public, by manner of contact, e.g., contact with sprayed vegetation, ingestion of vegetables, ingestion of surface water.

While we agree with DFA that it was not required to replicate the Caltrans EIR model, we include its description in part to expose the narrowness of DFA's concept of environmental review, which can be summed up in the following response to comments critical of its assessment of impacts from pesticide use in the PDCP: "The profiling of chemical and toxic properties of individual pesticide materials is outside the scope of environmental review of the PDCP. Review of physical and chemical characteristics and general toxicity of individual compounds is conducted by regulatory agencies which are tasked with determining safe use parameters. . . . [T]hose interested in detailed and comprehensive examination of the toxic and general use profiles of pesticide products, including those that may be selected for use in the PDCP, are referred to the agencies that regulate the use of these materials."

DFA also asserts that rather than ignoring the impact of pesticide use, it "extensively discussed in the administrative record the effects of pesticides likely to be used in the PDCP . . . ." This assertion is not supported by the record. Attempting to back up this statement, DFA points to nine pages which include a description of the label for one pesticide and some pesticide protocols; a general discussion of the public's concern about pesticides, hazards inherent in any pesticide use and the importance of following label directions; and conclusory statements about potential pesticide impacts, devoid of reference to any specific pesticide and without any citation to evidence, risk assessment or other toxicological information.

*Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1361 [20 Cal.Rptr.3d 808] does not aid DFA. There, challengers to a timber harvest plan—which is the functional equivalent of an EIR—claimed that the Department of Forestry and Fire Protection impermissibly relied solely on the state and federal herbicide registration processes in determining that potential herbicide use would not result in significant environmental impacts. (*Id.* at pp. 1338, 1362.) Dismissing this claim the reviewing court stated that both the department and the timber company "extensively discussed the particular pesticides that might be used, including potential environmental impacts. [¶] The use of herbicides by Sierra Pacific will be evaluated in the context of a specific setting under the regulatory program for the certification and use of pesticides, including herbicides. (Cal. Code Regs., tit. 14, § 15251, subd. (i).) The review and issuance of appropriate permits will be required." (*Id.* at p. 1362.) As we have shown, there was no extensive discussion here. Moreover, unlike the instant situation which almost guarantees pesticide use, the potential use of herbicides in *Ebbetts Pass* was deemed speculative. (*Ebbetts Pass, supra,* at pp. 1363–1364.)

For all these reasons we conclude that DFA abused its discretion by failing to fulfill its obligation under CEQA to analyze the environmental effects of statewide pesticide use under the rapid response and containment elements of the PDCP. This error infected the analysis of the impact from exposure to pesticides on people in nonagricultural areas—including individuals who are susceptible to health complications because of health or developmental status—upon activation of the emergency response program in their area and in distinctive locations such as schools, parks, hospitals, nursing homes; agricultural and nursery workers, upon activation of the containment program requiring growers and/or nursery owners in their vicinity to treat crops with pesticides; pesticide applicators and agricultural workers, upon applying pesticides under the PDCP;[8] and fish and wildlife, upon pesticide treatment in nonagricultural areas.[9]

---

[8] We note that with respect to worker health and safety, DFA relied on pesticide use restrictions as well as DPR's regulations governing the licensing and training of pesticide applicators (Cal. Code Regs., tit. 3, § 6500 et seq.) and pesticide worker safety regulations.

[9] Concerning the fate of fish and wildlife under the PDCP, appellants also criticize the built-in mitigation effort inherent in the consultation and communication protocols that have been set in place with other agencies, notably DFG, U.S. Fish and Wildlife, and Marine Fisheries. The gist of appellants' complaint is that they do not trust that the interagency environmental coordination and consultation processes will lead to any appropriate or enforceable mitigation measures to protect fish and wildlife. DFA has developed these protocols with the agencies directly responsible for protecting key aspects of our environment, to be triggered should conditions arise requiring mitigation efforts. We see no reason to question the good faith of DFA's interagency commitments.

4. *The Evaluation of Effects of Pesticides on Nontarget Organisms and Organic Farming Is Also Deficient*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C.–G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

H. *No Injunctive Relief at This Time*

Appellants asked the trial court to enjoin DFA from engaging in any activity pursuant to the PDCP until it met the requirements of CEQA. Here they insist we should direct the trial court to grant injunctive relief. We disagree.

▆▆ Section 21168.9 mandates that if a court finds that the decision of a public agency has not complied with CEQA, it must enter an order with one or more specified provisions. For instance, a court can issue an order enjoining activities that could adversely change or alter the environment, if it finds that such activities "will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project . . . ." (*Id.*, subd. (a)(2).) Traditional equitable principles govern the decision to grant or deny equitable relief. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 423.)

While we have found that the EIR was substantially flawed, we are not in a position to dictate the outcome of an EIR process to combat the GWS and Pierce's disease that is *not* flawed. Appellants assume that, with proper assessment and evaluation of the impacts of using proposed pesticides against the GWS, it is a foregone conclusion that significant impacts will be found, that reasonable mitigation measures exist that can substantially lessen or avoid these impacts, and therefore the subsequent EIR must describe such measures and adopt a monitoring program to track changes. (§§ 21002, 21002.1, subd. (a), 21081, subd. (a), 21081.6.) This very well may be, but we cannot foreordain these outcomes. Nor can we predict what conditions, in which type of locale or region of the state, will arise, and how DFA or the county agricultural commissioner will respond. We are not faced with a situation such as was present in *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 743 [32 Cal.Rptr.2d 704]. There, the reviewing court directed the lower court to issue an order enjoining

---

*See footnote, *ante*, page 1.

the county and the developer from approving or carrying out the development project and to suspend all activity that could result in any change or alteration to the physical environment of the project site until there was full compliance with CEQA. The court deemed injunctive relief necessary "to protect the site from adverse and possibly irreparable alteration prior to full and accurate assessment and disclosure of the scope and environmental impacts of the development project and to ensure adequate consideration of alternative sites and additional mitigation measures which may be identified in the revised EIR." (*Id.* at p. 741, fn. omitted.) In contrast to a development project which, once begun, may moot consideration of alternatives or mitigation measures, here we have a program EIR with an array of options for combating the GWS based on conditions as *they develop in the future.* At this point in time we conclude that any injunctive relief is best left to the trial court to fashion and decide.

## III. DISPOSITION

We reverse the judgment and remand to the Superior Court of San Francisco County with directions:

(1) To issue a writ of mandate vacating certification of the EIR as it pertains to the containment and rapid response elements of the EIR;

(2) To issue orders, after notice and hearing, that set a date by which DFA must certify a new EIR complying with CEQA consistent with the views expressed in this opinion;[10] and

(3) To determine, after notice and hearing, whether application of pesticides pursuant to the rapid response and containment components of the PDCP prior to full CEQA compliance and reapproval will prejudice consideration or implementation of particular mitigation measures or alternatives to the project and, if so, to issue appropriate relief pursuant to section 21168.9.

---

[10] Appellants have also challenged the adequacy of the EIR as a "program" EIR (see Guidelines, § 15168) and assert that the only legitimate way to rely on another agency's environmental analysis is to "tier" to the preexisting EIR. Appellants take too rigid an approach to EIR preparation. Public agencies may use various special types of EIR's to simplify preparation and avoid duplication, including "tiering," use of the program EIR, staged EIR and master EIR's. (See 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1st ed. 2004 update) § 11.2 pp. 426–427; *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1373–1374 [43 Cal.Rptr.2d 170].) It is up to DFA, in its discretion on remand, to select an appropriate streamlining process.

Appellants are entitled to costs on appeal.

Sepulveda, J., and Rivera, J., concurred.