[No. F058062. Fifth Dist. Aug. 10, 2010.]

EBBETTS PASS FOREST WATCH et al., Plaintiffs and Appellants, v. DEPARTMENT OF FORESTRY AND FIRE PROTECTION, Defendant and Respondent;
SIERRA PACIFIC INDUSTRIES, Real Party in Interest and Respondent.

378

COUNSEL

Lippe Gaffney Wagner, Thomas N. Lippe and John H. Curran for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, and William Jenkins, Deputy Attorney General, for Defendant and Respondent.

Morrison & Foerster, Edgar B. Washburn and William M. Sloan for Real Party in Interest and Respondent.

OPINION

**ARDAIZ, P. J.**—This case presents the issue of what constitutes a "successful party" under the private attorney general doctrine contained in Code of Civil Procedure section 1021.5.

Sierra Pacific Industries (SPI) submitted and California's Department of Forestry and Fire Protection (CDF) approved three timber harvest plans (Plans) for logging in Tuolumne County. Two conservation groups, Ebbetts Pass Forest Watch and the Central Sierra Environmental Resource Center (plaintiffs) sought to overturn the approvals contending that CDF had not followed the law in approving the Plans. The California Supreme Court upheld the Plans finding they "d[id] not suffer from the asserted legal flaws plaintiffs identify" and plaintiffs were not entitled to relief. (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 958 [77 Cal.Rptr.3d 239, 183 P.3d 1210] (*Ebbetts Pass*).) Despite this defeat, plaintiffs contend they are the "successful party" entitled to attorney fees of $250,819 under the private attorney general doctrine contained in Code of Civil Procedure section 1021.5.[1] The trial court disagreed and denied the fee request. We will affirm. In our view, the granting of attorney fees under the private attorney general doctrine would be an unwarranted expansion of section 1021.5. For the reasons stated *post*, we conclude plaintiffs were not "successful" within the meaning of that provision and have not justified fees pursuant to that statute.

## FACTS AND PROCEDURAL HISTORY

In May 2002, plaintiffs filed a petition for writ of mandate and asserted the Plans failed to comply with the Z'berg-Nejedly Forest Practice Act of 1973 (FPA),[2] the rules promulgated by the Board of Forestry under the Forest Practice Act,[3] and the California Environmental Quality Act (CEQA).[4] Specifically, the petition alleged that CDF had failed (1) to assess the cumulative impacts on sensitive wildlife species on a regional basis,[5] and (2) to assess adequately the potential significant impacts of herbicide use

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

[2] Public Resources Code section 4511 et seq.

[3] California Code of Regulations, title 14, section 895 et seq.

[4] Public Resources Code section 21000 et seq.

[5] The Supreme Court rejected plaintiffs' "core contention" in this regard (*Ebbetts Pass, supra*, 43 Cal.4th at p. 945) and they do not contend they succeeded on their cumulative impact challenge.

associated with the Plans. The prayer for relief requested (1) a peremptory writ of mandate ordering CDF to withdraw approval of the Plans, and (2) a permanent injunction enjoining the proposed timber operations until the Plans complied with California regulations and statutes. The prayer included a catchall request for "such other and further relief as the court deems proper," but did not include a request for declaratory relief, such as a declaration of CDF's authority and duty to analyze herbicide use.

In March 2003, the trial court denied plaintiffs' petition for a writ of mandate. The court found CDF did not act in excess of its jurisdiction in approving the Plans, the approval was supported by the findings and the findings were supported by substantial evidence in the record. This court's 2006 decision reversed the superior court and directed it to issue the writ of mandate.

In 2008, the California Supreme Court reversed the judgment of the Court of Appeal and remanded the matter for further proceedings. (*Ebbetts Pass, supra*, 43 Cal.4th at p. 958.) On remand, this court affirmed the trial court's denial of plaintiffs' petition for writ of mandate.

Subsequently, plaintiffs filed a motion for attorney fees under section 1021.5 and claimed they were a successful party because the published decision of the California Supreme Court clarified the law regarding CDF's authority and duty to analyze herbicide use. The motion asserted counsel had expended a total of 845.6 hours in the matter and that time was worth $374,357. Plaintiffs argued that, after a reasonable adjustment, they should be awarded attorney fees in the amount of $250,819. The trial court denied the motion and plaintiffs filed a timely notice of appeal.

## DISCUSSION

*Section 1021.5 Attorney Fees Awards*

Plaintiffs contend they were a successful party for purposes of section 1021.5 because they succeeded on their herbicide claims. SPI and CDF counter that plaintiffs were not a successful party because they failed on every claim asserted, judgment was entered against them and costs were awarded to CDF.

## A. Standard of Review

Generally, whether a party has met the statutory requirements for an award of attorney fees is best decided by the trial court, whose decision we review for abuse of discretion. (*Nestande v. Watson* (2003) 111 Cal.App.4th 232, 238 [4 Cal.Rptr.3d 18].) On review, we focus on whether the court applied the proper legal standards under section 1021.5 and, if so, whether the result was within the range of the court's discretion. (*Marine Forests Society v. California Coastal Com.* (2008) 160 Cal.App.4th 867, 876 [74 Cal.Rptr.3d 32].) When an appellate court issues an opinion, it is arguably in as good a position as the trial court to determine whether the legal right enforced through its opinion meets any of the three criteria of section 1021.5. (*Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 494 [30 Cal.Rptr.3d 202].) In this case, however, it is not the appellate court's opinion that resolved the lawsuit. Rather, the Supreme Court's opinion, which reversed the appellate court's opinion, is the relevant document for determining whether plaintiffs met the statutory requirements entitling them to attorney fees. Therefore, we will review the trial court's decision to deny attorney fees for abuse of discretion.

## B. Statutory Elements

■ Section 1021.5 codifies the private attorney general doctrine, which provides an exception to the "American rule" that each party bears its own attorney fees. (*Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1147 [74 Cal.Rptr.3d 81, 179 P.3d 882].) The fundamental objective of the private attorney general doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565 [21 Cal.Rptr.3d 331, 101 P.3d 140].) Under section 1021.5, the court may award attorney fees to (1) a successful party in any action (2) that has resulted in the enforcement of an important right affecting the public interest (3) if a significant benefit has been conferred on the general public or a large class of persons, and (4) the necessity and financial burden of private enforcement are such as to make the award appropriate. (*Ibid.*) The burden is on the claimant to establish each prerequisite to an award of attorney fees under section 1021.5. (*Serrano v. Stefan Merli Plastering Co., Inc.* (2010) 184 Cal.App.4th 178, 185 [108 Cal.Rptr.3d 777].)

### Successful Party

■ A party seeking an award of section 1021.5 attorney fees must first be "a successful party." A favorable final judgment is not necessary; the critical fact is the impact of the action. (*Graham v. DaimlerChrysler Corp., supra,* 34

Cal.4th at p. 565.) Plaintiffs may be considered successful if they succeed on any significant issue in the litigation that achieves some of the benefit they sought in bringing suit. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1292 [240 Cal.Rptr. 872, 743 P.2d 932].) But, there must be some qualitative selectivity because section 1021.5 specifically refers to litigation that vindicates "important" rights. It does not encompass the enforcement of "any" or "all" statutory rights. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 [154 Cal.Rptr. 503, 593 P.2d 200].) Thus, in determining whether a party is successful, the court must critically analyze the surrounding circumstances of the litigation and pragmatically assess the gains achieved by the action. (*Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 334 [31 Cal.Rptr.3d 599] (*Concerned Citizens*).)

### C.  Case Law

Plaintiffs rely on two cases, which they contend support their fee request. In *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078 [240 Cal.Rptr. 569, 742 P.2d 1290] (*Harbor*), the petitioners sought a peremptory writ of mandate and challenged the Governor's constitutional authority to veto a single provision of a bill containing 71 sections enacting, amending and repealing numerous provisions in numerous codes. (*Id.* at p. 1083.) The Supreme Court, agreeing with the petitioners, held that the Governor was without authority to exercise a line-item veto because the provision stricken did not constitute an appropriation. (*Id.* at pp. 1089–1093.) The court also held that the bill violated the single subject rule, and the Governor would have had the authority to veto the section at issue had it been properly enacted as a separate bill. (*Id.* at pp. 1101–1102.) The court noted that retroactive application of that ruling, however, would open the door to challenges of many other provisions of substantive law contained in similar acts. Thus, both rulings would be applied prospectively. As a result, the court denied the petitioners relief. (*Ibid.*) The court held, however, that the petitioners were entitled to attorney fees under section 1021.5. They were the successful party because the court's decision vindicated the principle upon which they brought the action, that the Governor's power to veto legislation could not be exercised to invalidate part of a bill that was not part of an appropriation bill. (*Harbor, supra*, 43 Cal.3d at p. 1103.)

In the second case, *Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288 [221 Cal.Rptr. 746] (*Sagaser*), the plaintiffs brought a CEQA challenge to the construction of a prison that the Court of Appeal dismissed as moot following the Legislature's passage of a bill that exempted the proposed prison from CEQA compliance. (*Sagaser, supra*, 176 Cal.App.3d at p. 298.) Regarding attorney fees, the court noted that the legislation also prohibited the prison from using local groundwater, the requested result of one of the plaintiffs' dismissed causes

of action and their primary area of environmental concern. The court remanded the matter to the trial court to determine if the plaintiffs' lawsuit affected the Legislature's decision to prohibit the use of groundwater. (*Id.* at p. 315.) If such a showing was made, the plaintiffs would be deemed successful parties and would be entitled to attorney fees under a catalyst theory of recovery. (*Ibid.*)

Both cases are distinguishable. In *Harbor*, the court agreed with the petitioners' primary contention but, for policy reasons, decided not to provide the petitioners with the benefit of that conclusion. *Harbor* involves a unique circumstance. In granting fees the court stated, "We believe [petitioners] are entitled to such an award, even though their named clients have not personally benefitted. They are the 'successful' party in that the impact of our decision is to vindicate the principle upon which they brought this action, i.e., that the Governor's power to veto legislation cannot be exercised to invalidate part of a bill which is not part of an appropriation bill. . . . It is obvious that private enforcement to give effect to [the specific provision] was necessary since the director of the department refused to promulgate regulations to implement the section." (*Harbor, supra*, 43 Cal.3d at p. 1103, citation omitted.)

In other words, the parties were forced to bring the lawsuit in order to enforce their rights under the statute and to assert that the Governor could not veto for the reason stated. In effect, while they lost on their basic assertion to enforce a right they argued was wrongly vetoed, the consequence was a significant determination of the Governor's veto power and the conclusion that the Governor could not do what he did.

In *Sagaser, supra*, 176 Cal.App.3d 288, the court remanded the case for a determination of whether the lawsuit was the catalyst for the Legislature's decision to prohibit the prison's use of groundwater, a primary goal of the lawsuit. Like *Harbor, supra*, 43 Cal.3d 1078, the award of attorney fees was based on the fact that the moving parties had or potentially had prevailed on their primary claim. In contrast, plaintiffs here lost on their primary contention that CDF's approval of the Plans must be overturned because SPI and CDF had not followed the law in analyzing the effects of potential herbicide use.

This case is more analogous to *Concerned Citizens, supra*, 131 Cal.App.4th 329. There, the petitioners sought a writ of mandate challenging the approval of a proposed Costco warehouse facility. They alleged six causes of action, one of which was the failure to comply with CEQA. The court rejected five of the causes of action, but agreed with one of the alleged CEQA defects, and found that a mitigated negative declaration certified by the city needed

revision. The city had failed to support its conclusion that the project would generate an insignificant increase in traffic through the adjacent neighborhoods. The trial court issued a writ rescinding approval of the project until the revision was made. (*Concerned Citizens, supra,* 131 Cal.App.4th at pp. 331–333.) Subsequently, the petitioners moved for attorney fees under section 1021.5, but the superior court denied the request finding that the petitioners were successful in one small regard and were unsuccessful on all significant issues. (*Concerned Citizens, supra,* 131 Cal.App.4th at p. 333.)

On appeal, the petitioners argued the litigation conferred a significant benefit on a large segment of the public. They asserted that all commuters in the vicinity of the project benefited from requiring the city to comply with CEQA, which was enacted to protect the public interest. (*Concerned Citizens, supra,* 131 Cal.App.4th at pp. 334–335.) The Court of Appeal disagreed and held the mere vindication of a statutory violation was not sufficient to be considered a substantial benefit by itself. (*Id.* at p. 335.) While the trial court agreed the project did not adequately support the conclusion that the effects of cut-through traffic were mitigated, it felt the inadequacy was a " 'minute blemish' " that could be repaired. (*Ibid.*) At best, the petitioners had successfully asserted a defect in CEQA's process, the correction of which was not likely to change the project. (*Concerned Citizens, supra,* 131 Cal.App.4th at p. 335; and see *Marine Forests Society v. California Coastal Com., supra,* 160 Cal.App.4th at pp. 879–880 [corporation that unsuccessfully challenged California Coastal Commission authority to require it to remove experimental reef was not entitled to attorney fees; even though action resulted in amendment of statute governing composition of the commission, corporation did not achieve its primary goal of preventing removal of reef].)

Analogously, in *Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330 [108 Cal.Rptr.3d 40] (*Karuk Tribe*), the petitioners sought a writ of mandate to compel a regional water quality control board to apply state law with regard to hydroelectric dams operating under a federal license. On its own initiative, the trial court remanded the matter back to the board to provide " 'a more complete' " explanation of its decision rejecting the petitioners' request. Subsequently, the trial court agreed with the board that they were without authority to enforce the state's law. (*Id.* at pp. 334–335.) Despite the defeat, the trial court awarded attorney fees under section 1021.5 to the petitioners finding that the "litigation had resulted in the 'important public benefit' of the Board making 'a thoughtful and well-reasoned determination' concerning its lack of authority to enforce state law." (*Karuk Tribe, supra,* 183 Cal.App.4th at pp. 334–335.)

The appellate court reversed the attorney fee order. The petitioners did not qualify as successful parties because they did not achieve their strategic objective. Nor did the action result in the enforcement of an important right affecting the public interest or confer a significant benefit on the general public or a large class of persons. As a result of the litigation, the board merely augmented the reasoning behind its decision that it was without authority to grant the petitioners' request that it enforce state law. As a matter of law, the court concluded, it was not worth $138,250 to have a state agency polish up the reasoning supporting a decision that was already more than legally sufficient. (*Karuk Tribe, supra*, 183 Cal.App.4th at p. 335.)

### D. *Analysis*

Here, the trial court denied attorney fees based on its conclusions that (1) the lawsuit did not result in any change to the Plans under review, (2) the Supreme Court's decision did not establish new case law, (3) CDF's misunderstanding of the law did not result in a dereliction of its duties under CEQA, and (4) CDF's behavior would not change prospectively as a result of the litigation because CDF had conducted the environmental impact assessments in regards to herbicide application as required by CEQA for timber harvest plans. In short, the litigation did not result in the vindication of an important right affecting the public interest and plaintiffs had not achieved any of the benefits sought in bringing the litigation.

On appeal, plaintiffs assert they succeeded on their herbicide claims in three regards. The Supreme Court agreed with their assertions that CDF erred by stating (1) it lacked authority to regulate herbicide applications on private lands, (2) any use of herbicides in compliance with Department of Pesticide Regulation restrictions could not have any significant impact on the environment, and (3) SPI's postharvest use of herbicides was too speculative to be part of the project subject to CEQA. Further, they vindicated an important right, the fundamental legislative goals of CEQA and the FPA to protect the environment, and conferred a significant benefit on the public by obtaining a published Supreme Court opinion that corrected CDF's errors regarding its authority and duty to regulate herbicide use in the Plans.

We are not persuaded. When the Supreme Court's agreement statements are read pragmatically and in context, they do not support the conclusion that plaintiffs succeeded on any significant issue in the litigation that achieved some of the benefit they sought in bringing suit.

*Ebbetts Pass*

Plaintiffs sought a writ of mandate to overturn the Plan approvals and to enjoin logging operations. They contended that CDF had not followed the law, its implementing regulations and CEQA in analyzing the effects of SPI's possible use of herbicides after logging. As pertinent to their attorney fees claim, they argued, (1) CDF improperly asserted it had no authority and duty to analyze the use of pesticides in the Plans (*Ebbetts Pass, supra*, 43 Cal.4th at p. 953); (2) SPI and CDF improperly relied on the Department of Pesticide Regulation's registration of the herbicides as excusing further environmental analysis (*id.* at p. 956); and (3) the Plans incorrectly deemed herbicide use too speculative for impacts analysis (*id.* at pp. 955–956). Plaintiffs claim the Supreme Court agreed with each of these contentions making them a successful party. We consider the first two contentions together and then the third.

First, plaintiffs challenged CDF's statement that it had no authority to approve or disapprove herbicide applications. In response to a public comment that the Plans failed to assess the impacts of herbicide use, CDF responded that because it was not the regulating authority for herbicide applications on private land, it did not " 'have the authority to approve or disapprove any project regarding the use of chemicals.' " (*Ebbetts Pass, supra*, 43 Cal.4th at p. 953.) In addressing this claim, the Supreme Court stated, "CDF . . . had no grounds to state . . . that because of the Department of Pesticide Regulation's registration program 'we do not have the authority to approve or disapprove any project regarding the use of chemicals.' To the contrary, as the lead agency evaluating timber harvests, CDF has not only the authority but also the duty to approve, disapprove, and impose mitigation measures on timber harvest plans, including measures to address the foreseeable use of herbicides in planned silvicultural operations." (*Id.* at p. 957.)

Second, CDF also stated, " 'CDF is barred from repeating the environmental analysis conducted by' the Department of Pesticide Regulation, and because use of an herbicide in compliance with the restrictions imposed by the Department of Pesticide Regulation 'would not have a significant effect on the environment, CDF is not required to analyze the use in the [Plans].' " (*Ebbetts Pass, supra*, 43 Cal.4th at p. 953.) The Supreme Court responded, "Nor was CDF correct in concluding that any use of an herbicide in compliance with Department of Pesticide Regulation label restrictions necessarily 'would not have a significant effect on the environment.' " (*Id.* at p. 957.)

The court's analysis of both contentions continued: "If the [Plans] and CDF's response to public comments on it had relied entirely on the Department of Pesticide Regulation's regulatory program and had not themselves analyzed the significant environmental effects, mitigation measures, and alternatives to herbicide use on the harvested sites, we would agree that CDF failed in its duty to consider and disclose information relevant to its decision. [Citation omitted.] But neither the [Plans] nor CDF's response halted its analysis at that point. Rather, as demonstrated by our earlier summary of the two documents, they both continued with an extensive discussion of potential impacts, mitigation measures, and alternatives to herbicide use. CDF thus did not erroneously rely on the Department of Pesticide Regulation's regulatory program and fail to conduct its own environmental impacts assessment. (Accord, *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* [(2004)] 123 Cal.App.4th [1331, 1362] [20 Cal.Rptr.3d 808].)" (*Ebbetts Pass, supra,* 43 Cal.4th at p. 957.)

Third, plaintiffs contended the Plans and CDF's responses improperly deemed pesticide use too speculative for impacts analysis. The Supreme Court agreed, "the plan incorrectly characterizes herbicide use as 'too speculative' for present analysis." (*Ebbetts Pass, supra,* 43 Cal.4th at p. 955.) After substantively examining the Plans and comments, however, the court concluded, "[a]lthough some statements in the [Plans] and CDF's response support plaintiffs' argument, we disagree that the documents actually fail, in these respects, to assess the environmental impacts of [SPI's] possible future herbicide use." (*Id.* at p. 954.) Further, "CDF did not abuse its discretion by accepting the plans' finding that the precise parameters of future herbicide use could not be predicted, and hence failing to demand a more detailed, site-specific analysis of impacts and mitigation measures." (*Id.* at pp. 955–956.)

After considering all of plaintiffs' contentions, the Supreme Court concluded, "[t]he three [Plans], and CDF's response to public comments on them, do not suffer from the asserted legal flaws plaintiffs identify." (*Ebbetts Pass, supra,* 43 Cal.4th at p. 958.)

In our view, this case turns on a rather basic perspective of what constitutes a successful lawsuit. It seems anomalous that a party could bring a lawsuit, lose the lawsuit and effectively lose with respect to the goal of their lawsuit and still require the public to pay for their attorney fees. Yet that would be the consequence of plaintiffs' argument and the dissent's conclusion.

Here, plaintiffs lost because the record did not justify their winning under the law. While it may be argued that their contentions resulted in clarification of legal issues, the fact remains that contentions do not supplant evidence.

The real problem is that regardless of the expansion of the law, they did not have a factually meritorious lawsuit and, when the dust settled, their only victory was in a statement of law that when applied to the record clarified why they should lose. Unlike *Harbor, supra,* 43 Cal.3d 1078, it was not a new and significant legal interpretation upon which the case turned; rather, it was simply the facts. Under these circumstances we fail to see why the opposing parties, SPI and CDF, should be forced to pay legal fees for a lawsuit that was not justified in the first instance and found no validation in the last instance.

■ In effect, like any other plaintiff, plaintiffs' path to success breaks down into two well-defined and critical aspects of a lawsuit: the facts and the law. Clearly one must have a well-defined legal basis in order to give rise to a claim of right but one must also prevail on factual conclusions that support the claim of right. In the final analysis, plaintiffs should not be placed in a better position than any other party who brings a lawsuit and loses as a result of failure of proof. That plaintiff may have, in part, received a favorable clarification of the law does not relieve them from proving the facts that under the clarification would justify relief.

■ Plaintiffs have failed to meet their burden to show they were successful within the meaning of section 1021.5. They did not receive a favorable judgment nor did they achieve their strategic objectives of overturning the Plans' approval and halting timber operations until additional environmental assessments were performed. Our realistic, pragmatic assessment of the impact of this litigation based on the Supreme Court's opinion leads to the conclusion that the trial court did not abuse its discretion in denying attorney fees.

While the Supreme Court agreed with plaintiffs' preliminary contentions, the court rejected the corresponding factual contentions that the challenged Plans and CDF's comments were substantively defective. Instead, the court found that SPI and CDF had complied with the applicable environmental laws and had adequately assessed the environmental impacts of potential herbicide use despite their claim that they need not do so. (*Ebbetts Pass, supra,* 43 Cal.4th at pp. 952, 953, 958.) Therefore, while the court may have clarified the law regarding plaintiffs' legal contentions, the court rejected those contentions because they lacked support in the record and denied plaintiffs the relief they requested. To conclude that plaintiffs were successful under these circumstances would be an unwarranted expansion of section 1021.5.

Because plaintiffs did not meet the threshold requirement of establishing that they were a successful party, we need not determine whether they meet the remaining requirements.

**DISPOSITION**

The judgment is affirmed.

Levy, J., concurred.

**DAWSON, J.,** Dissenting.—I disagree with the majority's conclusion that Ebbetts Pass Forest Watch and Central Sierra Environmental Resource Center (plaintiffs) were not "qualitatively" successful parties in this litigation. I believe they were partially successful, which is enough.[1] I also believe their success involves issues of significant concern both to the general public and to those who seek to enforce the goals of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and its incarnation applicable to forest lands, the Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq.). For those reasons, as more fully explained below, and to encourage a vigilance toward protection both of the environment and informed self-government, I believe plaintiffs are entitled to recover some of their attorney fees.[2]

I. *Background*

Plaintiffs won three legal issues decided by the California Supreme Court in *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936 [77 Cal.Rptr.3d 239, 183 P.3d 1210] (*Ebbetts Pass II*), but obtained no actual relief. The reason plaintiffs obtained no relief was that both Sierra Pacific Industries (Sierra Pacific) and California's Department of Forestry and Fire Protection (CDF) presented an adequate alternate analysis to their discussion that contained legal errors.

The timber harvest plans submitted by Sierra Pacific dealt with potential herbicide use in two ways. First, Sierra Pacific asserted herbicide use was not part of the project and, therefore, there was no requirement that such use be disclosed in the timber harvest plans. Second, as an alternative to its no-project approach, Sierra Pacific discussed the potential impacts of herbicide use as though that use were part of the project covered by the plans.

---

[1] "Partial success is generally relevant only to the amount of fees, not to whether the party is entitled to fees . . ." and factors relating to the two questions should not be merged. (Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. 2008) § 2.19, pp. 57–58.)

[2] The amount awarded, of course, would reflect that plaintiffs were only partially successful and would not compensate them for their efforts on other issues. I recognized that too large an award in this case might have created incentives beyond those intended by the private attorney general doctrine. This concern, however, could have been addressed in the first instance by the trial court when it determined the amount of the award and in the second instance by a reviewing court.

Plaintiffs convinced the California Supreme Court that Sierra Pacific's no-project approach to herbicide use was wrong, but failed to convince the court that the alternate discussion of the impacts of herbicide use was inadequate.

Similarly, CDF's response to public comments presented alternate analyses of herbicide use. Initially, CDF asserted it had no authority to address potential herbicide use and that compliance with the restrictions established by the Department of Pesticide Regulation would, as a matter of law, dictate a finding of no significant environmental impact. Alternatively, CDF provided an assessment of potential environmental impacts of herbicide use. (*Ebbetts Pass II, supra,* 43 Cal.4th at p. 957.)

Plaintiffs convinced the Supreme Court that CDF's first alternative was erroneous, but failed to demonstrate CDF's second alternative was wrong. As a result, the Supreme Court upheld CDF's approval of the timber harvest plans.

The question presented in this appeal is whether plaintiffs' victories on three legal issues decided by the Supreme Court satisfied the requirements of Code of Civil Procedure section 1021.5. Specifically, were plaintiffs successful parties in an action that resulted in the enforcement of an important right affecting the public interest and that conferred a significant benefit on the general public or a large class of persons?

The trial court answered this question in the negative, concluding that the lawsuit did not vindicate an important right affecting the public interest or achieve any of the benefits sought by plaintiffs in pursuing the mandamus petition. The court's conclusion was based on certain determinations it labeled "Findings."

II. *Trial Court's Erroneous Findings*

I will begin by discussing the trial court's findings I believe are wrong.

A. Ebbetts Pass II *Is New Case Law*

I believe the trial court erred in finding that the Supreme Court's decision in *Ebbetts Pass II* did not establish new case law. Though labeled a "finding," this determination depends upon an interpretation of the Supreme Court's opinion and existing case law, which is a question that can be decided as a matter of law and thus is subject to independent review on appeal.

1. *CDF's authority*

The Supreme Court's opinion set forth the legal principle that "as the lead agency evaluating timber harvests, CDF has not only the authority but also

the duty to approve, disapprove, and impose mitigation measures on timber harvest plans, including measures to address the foreseeable use of herbicides in planned silvicultural operations." (*Ebbetts Pass II, supra,* 43 Cal.4th at p. 957.) The Supreme Court cited no case that adopted this legal principle. Similarly, neither the trial court, CDF, nor Sierra Pacific cited any case that sets forth this principle regarding CDF's authority.

Therefore, *Ebbetts Pass II* did establish new case law because it (a) resolved an issue disputed by the parties and (b) adopted a legal principle regarding CDF's authority that had not been stated in any other published case.

### 2.  *Compliance with label restrictions*

The Supreme Court's opinion also included the following conclusion of law: "Nor was CDF correct in concluding that any use of an herbicide in compliance with Department of Pesticide Regulation label restrictions necessarily 'would not have a significant effect on the environment.' (See *Californians for Alternatives to Toxics v. Department of Food & Agriculture* [(2005)] 136 Cal.App.4th [1,] 17 [38 Cal.Rptr.3d 638] ['Nor is there legal authority for the proposition that using registered pesticides according to their labels never results in significant adverse effects.']; cf. *Oregon Environmental Council v. Kunzman* (9th Cir. 1983) 714 F.2d 901, 905 [' "the mere fact that a program involves use of substances registered under FIFRA [federal pesticide law] does not exempt the program from the requirements of NEPA [federal environmental law]" '].)" (*Ebbetts Pass II, supra,* 43 Cal.4th at p. 957.)

An indication that the Supreme Court's opinion established a principle not set forth in other cases is its use of the introductory signal "see" in the citation that supports its conclusion. The California Style Manual states that "[c]itations to weaker support, however, should be introduced by the word 'see.' Thus, 'see' should precede citations to cases that only indirectly support the text, citations to supporting dicta, and citations to a concurring or dissenting opinion." (Cal. Style Manual (4th ed. 2000) § 1:4, pp. 9–10.) I am aware of no basis for concluding that the court was mistaken in its use of the introductory signal.

Furthermore, no previously published case had rejected the proposition that the Department of Pesticide Regulation's registration of herbicides excused *CDF* from assessing those herbicides' use *as part of a particular timber harvest plan* (see *Ebbetts Pass II, supra,* 43 Cal.4th at p. 956) or in any other context.

*Californians for Alternatives to Toxics v. Department of Food & Agriculture, supra,* 136 Cal.App.4th 1 can be read as adopting the general

principle that the existence of the Department of Pesticide Regulation's registration program does not remove the environmental impacts of pesticide use from the proper scope of an environmental impact report or an environmental impact report equivalent. But even if the case is read as establishing this general principle, (a) the principle had never been applied to CDF or to timber harvest plans and (b) CDF did not concede its application in this case. Instead, the brief the Attorney General's Office filed in the Supreme Court in *Ebbetts Pass II, supra,* 43 Cal.4th 936 on October 13, 2006, argued that "CDF's statement, that use of registered pesticides in accordance with federal and state law would not or should not have a significant effect, is reasonable and supported by a fair reading of the Department of Pesticide Regulations program."

Consequently, *Ebbetts Pass II* is new in the sense that it (1) resolved an issue disputed by the parties and (2) extended the principle contained in *Californians for Alternatives to Toxics v. Department of Food & Agriculture* to CDF and its review of timber harvest plans, which is a significantly different factual situation. (See *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1103 [240 Cal.Rptr. 569, 742 P.2d 1290] [petitioners entitled to attorney fees under Code Civ. Proc., § 1021.5 where Supreme Court's decision applied existing precedent to a distinct factual situation].)

### 3. *Scope of the project*

Sierra Pacific's timber harvest plans stated that the use of herbicides after the proposed harvest to suppress competing vegetation (1) was not a project under CEQA and (2) was not part of the timber harvest plan project because the critical details of use were not yet known. In support of this assertion, the timber harvest plans asserted "there is no requirement in the [California Code of Regulations, title 14, section 895.1] definition of 'reasonably foreseeable future projects' that indicates that herbicide application is a 'project' as defined. Since the disclosure of activities in [California Code of Regulations, title 14, section 912.9] is tied to projects, disclosure of herbicide application activities is not required." In addition, the timber harvest plans stated: "Some would contend that a [timber harvest plan] should contain an analysis of the impacts of potential herbicide spraying in the future. [Sierra Pacific] feels that the use of herbicides is entirely too speculative to be considered as part of a [timber harvest plan] project."

The Supreme Court concluded that the timber harvest plans incorrectly stated that herbicide use was too speculative for present analysis. (*Ebbetts Pass II, supra,* 43 Cal.4th at p. 955.) This conclusion and the court's subsequent analysis necessarily imply the plans were wrong in stating that potential herbicide use was not part of the project. In reaching this conclusion

regarding the scope of the project, the Supreme Court resolved an issue of law. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 382 [60 Cal.Rptr.3d 247, 160 P.3d 116] [whether an activity is a project is a question of law].)

The Supreme Court's resolution of this question of law is the first published decision to conclude that future herbicide use is part of the project covered by a timber harvest plan. The question was not resolved in the analysis of herbicide use set forth in *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1361–1364 [20 Cal.Rptr.3d 808] (*Ebbetts Pass I*). Instead, that court appears to have concluded that any error did not exist or that it was unimportant (i.e., not prejudicial) because the timber harvest plans and CDF's comments provided an extensive discussion of herbicide use and its potential impacts. Besides *Ebbetts Pass I* and *Ebbetts Pass II*, no other published decision mentions the question whether the potential use of herbicide in connection with a timber harvest plan is part of the project that must be addressed in the plan. Therefore, *Ebbetts Pass II*'s ruling on this legal issue is unique. Although the ruling can be viewed as the result of applying existing rules of law that define speculativeness and its opposite, foreseeability, to herbicide use, the conclusion in *Ebbetts Pass II* is new in the sense that it applies those definitions to a set of facts significantly different from those addressed in other published opinions.

### 4. *Summary*

I believe the Supreme Court's decision created new law because it (1) set forth two new legal principles regarding CDF's authority and its duty to review potential herbicide use and (2) reached a conclusion of law regarding the scope of the project covered by a timber harvest plan that had not been set forth in any other published decision.

### B. *Changes Resulting from the Litigation*

I also believe the trial court erred in finding that "CDF's behavior will not change prospectively as a result of the litigation." This *ex ante* finding of fact was of sufficient concern that prior to oral argument this court sent counsel a letter stating they should be prepared to address the following issues:

"(1) Do CDF's official responses to public comments to timber harvest plans continue to assert ' "we do not have the authority to approve or disapprove any project regarding the use of chemicals" '? ([*Ebbetts Pass II, supra,*] 43 Cal.4th 936, 957 . . . .)

"(2) Do CDF's official responses to public comments to timber harvest plans continue to include CDF's conclusion 'that any use of an herbicide in compliance with Department of Pesticide Regulation label restrictions necessarily "would not have a significant effect on the environment" '? (*Ebbetts Pass II, supra*, 43 Cal.4th at p. 957.)

"(3) Do Sierra Pacific's timber harvest plans continue to 'incorrectly characterize[] herbicide use as "too speculative" for present analysis'? (*Ebbetts Pass II, supra*, 43 Cal.4th at p. 955.)"[3]

At oral argument, the deputy attorney general arguing on behalf of CDF conceded that CDF's official responses to public comments no longer contain the erroneous statements explicitly identified by our Supreme Court. Also, counsel for Sierra Pacific did not assert that its timber harvest plans continue to characterize herbicide use as too speculative for present analysis. Furthermore, after reviewing the arguments that CDF presented to the California Supreme Court in its brief in *Ebbetts Pass II*, I am unconvinced by CDF's claim that the present litigation did not lead to the change in its responses to comments.

Rather, I believe it was due to plaintiffs' vigilance both during the administrative proceedings that led to this litigation and throughout the litigation itself that Sierra Pacific was not and will not be able to avoid consideration of the impact of herbicide use either in this or future timber harvest plans and CDF was not and will not be able to abdicate its responsibilities in connection with such.

III.  *Pragmatic Assessment of Gains Achieved, Importance and Significance*

A.  *Gains Achieved*

Plaintiffs' victories on the three legal issues did not result in any relief involving the three timber harvest plans that were the subject of this lawsuit. Consequently, from a pragmatic point of view, the gains achieved by plaintiffs will be the impact that resolution of the three legal issues has on future timber harvest plans.

One type of impact concerns the contents of the environmental review documents. Timber harvest plans will no longer contain the erroneous view

---

[3] To encourage candid answers to these questions, our letter also asked whether the court should take judicial notice of the contents of a timber harvest plan and CDF's related official responses that were before the court in *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (July 2, 2010, F058000) (nonpub. opn.). CDF's official responses in that case were issued in October 2008, approximately five months after the Supreme Court's decision in *Ebbetts Pass II*. In view of counsels' concessions at oral argument, judicial notice of the recent documents is unnecessary.

that herbicide use is not part of the project. Similarly, CDF's responses to public comments will no longer misinform the public that (1) herbicides used in accordance with label restrictions will not, as a matter of law, cause a significant environmental impact and (2) CDF lacks the authority to evaluate herbicide use and approve, disapprove, or impose mitigation measures on that use.

Another impact of the opinion in *Ebbetts Pass II* is that it narrows the options available to Sierra Pacific and CDF for addressing herbicide use in future timber harvest plans and responses to public comments. Without the decision in *Ebbetts Pass II*, Sierra Pacific or CDF could have chosen to rely exclusively on their erroneous approach to herbicide use and eliminated any alternative approach that assessed the environmental impact of the herbicide use.

I believe these gains establish the requisite success. I would not adopt a new legal standard that limits success under Code of Civil Procedure section 1021.5 to cases where a plaintiff has proven facts that justify relief, particularly because (1) such a standard is difficult to square with the decision in *Harbor v. Deukmejian, supra*, 43 Cal.3d 1078 to award fees even though the facts of that case did not justify any relief and (2) it diverts the analysis from other types of gains that can be achieved by private litigants and from the importance and significance of those gains.

## B. *Importance*

The importance of the changes or gains achieved is assessed in terms of the relationship of the changes to the achievement of fundamental legislative goals. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 [154 Cal.Rptr. 503, 593 P.2d 200].)

The dual goals of California environmental legislation are protection of (1) the environment and (2) informed self-government. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].) The latter goal is reflected in the provisions of Public Resources Code section 21003, subdivision (b), which state that it is the policy of California that environmental review documents be "written in a manner that will be meaningful and useful to decisionmakers and to the public." Environmental review documents are meaningful and useful to the public insofar as informed self-government is concerned when they promote accountability. "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it

disagrees." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].)

As a result of *Ebbetts Pass II*, CDF will no longer be confused regarding the scope of its duties and can no longer deflect accountability for its conclusions by providing the public with the erroneous alternate explanation that (1) it has no authority to analyze herbicide use and (2) following label restrictions necessarily will adequately protect the environment. Also, timber harvest plans will be foreclosed from misinforming the public about the scope of the project covered. The elimination of this misinformation from the timber harvest plan review process is important because of its relationship to the fundamental legislative goal of protecting informed self-government.[4]

Another indication of the importance of the three issues is that the California Supreme Court decided to address them in its decision. Had the court thought the issues were unimportant or insignificant, it could have taken the analytical path used by the Third Appellate District in *Ebbetts Pass I*, *supra*, 123 Cal.App.4th at pages 1361–1364 and avoided discussing the issues. Instead, the Supreme Court made the effort to take a longer analytical route. Presumably, it made this effort for a reason, and I believe the reason was that the court (1) considered it important to correct CDF's erroneous view of (a) its authority and (b) the effect of the Department of Pesticide Regulation's restrictions and (2) wished to foreclose future assertions by CDF of the positions advocated in its Supreme Court briefs.

## C. *Significance*

The legal principles on which plaintiffs prevailed before the Supreme Court will confer a significant benefit on the general public. CDF is a state agency that was mistaken on a fundamental question—its own authority. Furthermore, the authority in question—the regulation of herbicide use on forest land—has broad application in California, particularly with CDF's approval of plantation silviculture. The Cedar Flat timber harvest plan states that California's commercial timberland covers approximately 19 million acres. Thus, resolution of the question concerning CDF's authority is more significant than the resolution of a question concerning a local government's approval of a single development that will not be repeated in the future.

---

[4] I also believe the trial court was not entirely correct in finding that CDF's misunderstanding of its responsibilities did not result in a dereliction of its duties under CEQA. It is true that CDF performed some of its duties, but CDF failed in its duty to provide accurate information to the public regarding which public officials are responsible for decisions affecting the environment.

In addition, I believe the clarification of governmental authority is more significant to the public where an agency is vigorously *denying* the authority with which it has been entrusted.

Thus, the Supreme Court's rejection of (1) Sierra Pacific's attempt to exempt from the timber harvest plan process its use of herbicides in plantation forestry, (2) CDF's position that it lacked authority to regulate herbicide applications in connection with plantation forestry, and (3) CDF's position that such use of herbicides would have no significant environmental impact as a matter of law, so long as application of the herbicides complied with broad restrictions imposed by the Department of Pesticide Regulation but not targeted at forestry, will stand as a lasting and significant benefit to the general public.

IV. *Benefit Sought*

Finally, I disagree with the majority's determination that plaintiffs failed to achieve some of the benefit they sought in bringing suit. (See *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1292 [240 Cal.Rptr. 872, 743 P.2d 932].)

Plaintiffs' verified petition alleged that CDF abused its discretion by failing to assess the potential significant impacts of herbicide use associated with Sierra Pacific's three timber harvest plans. Plaintiffs could not have prevailed on this claim unless they prevailed on the foundational issues that (1) herbicide use was part of the project covered by the timber harvest plans, (2) CDF had the authority to evaluate the environmental impacts from the potential herbicide use and (3) the environmental impacts from the herbicide use could be significant even if the herbicides were applied in accordance with the restrictions imposed by the Department of Pesticide Regulation. In other words, the allegations and prayer for relief in plaintiffs' petition necessarily encompassed the specific legal issues that were decided by the California Supreme Court in favor of plaintiffs. (Cf. *Gross v. FBL Financial Services, Inc.* (2009) 557 U.S. \_\_\_, \_\_\_, fn. 1 [174 L.Ed.2d 119, 129 S.Ct. 2343, 2348, fn. 1] [threshold issues are fairly included in the questions raised in the parties briefing].)

Also, plaintiffs' opening appellate brief in the appeal on the merits filed September 10, 2003, included the following heading: "**CDF Has the Legal Authority to Evaluate Herbicide Impacts on THPs.**" (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (Oct. 28, 2008, F042896) [nonpub. opn.].) Under that heading, plaintiffs attacked Sierra Pacific's "project" based arguments as well as CDF's position regarding its authority.

Thus, based on my comparison of plaintiffs' pleadings and briefing to the issues on which they prevailed, I believe plaintiffs made it part of the way to achieving their primary goal regarding herbicide use and in so doing achieved part of the benefit they sought in bringing this lawsuit.

In *Harbor v. Deukmejian, supra*, 43 Cal.3d 1078, the California Supreme Court stated the petitioners were "the 'successful' party in that the impact of our decision is to vindicate the principle upon which they brought this action . . . ." (*Id.* at p. 1103.) Here, plaintiffs achieved a similar success because (1) the California Supreme Court's decision vindicated some of the principles upon which they brought this action and (2) these principles would not have been vindicated outside of a private enforcement action, because both CDF and its counsel, the Attorney General's Office, vigorously opposed the principles advocated by plaintiffs and adopted by the Supreme Court. Thus, like the petitioners in *Harbor*, it is not anomalous for plaintiffs to recover some of their attorney fees under the private attorney general fee doctrine despite their failure to obtain actual relief in this lawsuit.

Lastly, I am unable to discern how the public policies underlying Code of Civil Procedure section 1021.5 would be served by denying fees to plaintiffs who pursue environmental litigation on the ground that they did not separately plead every foundational issue that underlies their broader claim. I am concerned that the majority's decision will have the unintended consequence of incentivizing plaintiffs in environmental litigation to specifically plead every foundational issue underlying their claims and perhaps include a request for declaratory relief on each of those issues. In my view, environmental litigation under California's statutes is complex enough without applying the benefit-sought aspect of the private attorney general doctrine in a manner that incentivizes plaintiffs to increase the complexity of that litigation.

V. *Conclusion*

Where a state agency vigorously denies it is responsible for assessing the environmental impact of a particular activity, such as herbicide use, that will repeatedly come before it in connection with the proposals the agency must approve or disapprove, and is supported in this denial by the Attorney General's Office, I believe a plaintiff that obtains a Supreme Court decision clarifying the agency's authority is entitled to recover some of its attorney fees under the private attorney general doctrine set forth in Code of Civil Procedure section 1021.5.

For all these reasons, I would remand this matter to the trial court for application of the lodestar adjustment method for determining the appropriate amount of attorney fees that should be awarded to the plaintiffs. (*EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 787–788 [75 Cal.Rptr.3d 902].)

Appellants' petition for review by the Supreme Court was denied November 11, 2010, S186500. Baxter, J., did not participate therein.